# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. JAMES STRONG POWELL

**Direct Appeal from the Circuit Court for Hardin County**
**No. 9309     Stella L. Hargrove, Judge**

---

**No. W2011-02685-CCA-R3-CD - Filed April 26, 2013**

---

Defendant, James Strong Powell, an attorney, was indicted for aggravated perjury. Defendant was convicted as charged by a jury and sentenced by the trial court to serve two years, seven months, and nine days in confinement as a Range I standard offender. Defendant now appeals his conviction and sentence. Defendant asserts that the trial court erred by: 1) allowing the trial judge, who presided over the hearing at which Defendant was alleged to have perjured himself, to testify at trial beyond the scope of the trial judge's expertise; and 2) denying Defendant's request for a sentence of full probation. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Guy T. Wilkinson, District Public Defender; and Billy R. Roe, Jr., Assistant Public Defender, (on appeal), and Joe L. Brown, Savannah, Tennessee, (at trial), for the appellant, James Strong Powell.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

Attorney Curtis Hopper testified that he had 19 years of experience as a trial lawyer. He represented the Hardin County mayor, Kevin Davis, one of the defendants in civil case

7424 in the Hardin County Chancery Court. Defendant represented the plaintiffs, Concerned Citizens of Hardin County, et al. The complaint was filed on April 23, 2009. Mr. Hopper filed a motion to dismiss the lawsuit for failure to state a claim pursuant to Tennessee Rule of Civil Procedure 12. The chancery court granted the motion to dismiss at a hearing on May 22, 2009. Mr. Hopper prepared an order reflecting the court's ruling and twice faxed it to Defendant's office for his approval. Mr. Hopper testified that he did not hear any response from Defendant regarding his approval or disapproval of the proposed order. At approximately 8:30 a.m., on the morning of June 9, 2009, Mr. Hopper saw from his office Defendant walking to the Hardin County Courthouse, and Mr. Hopper followed Defendant inside. Mr. Hopper testified that he saw Defendant sign the order in the hallway, and shortly thereafter Mr. Hopper obtained the Chancellor's signature and filed the order in the clerk's office.

On August 27, 2009, the same plaintiffs, through a new attorney, filed a second lawsuit, case number 7447, against the same defendants. Mr. Hopper testified, "essentially, it was the same lawsuit. It was – had a few extra issues added into it, but requesting the same thing." Chancellor Harmon, who had granted the motion dismissing the first lawsuit, recused himself in case 7447, and Circuit Court Judge Donald Parish was assigned to hear the case. Mr. Hopper testified that the school board and the county filed a joint motion to dismiss the case on the basis of res judicata. The motion was granted, and case 7447 was dismissed by a written order entered on October 19, 2009. The plaintiffs' attorney did not file an appeal from the order dismissing case 7447. Subsequently, the plaintiffs filed a motion for relief from judgment, pursuant to Rule 60 of the Rules of Civil Procedure, seeking to reopen case 7424, the first case. Attached to the motion for relief from judgment was an affidavit of Defendant. The affidavit stated in pertinent part:

> 3. All parties present at the hearing [in case 7424, on the defendants' Rule 12 motion to dismiss] understood that the case was being dismissed on technical grounds, and that the way was being left open for the Petitioners to cure defects in the pleading, and to re-file the lawsuit.
>
> 4. The Dismissal in that case was understood by all present to be a dismissal without prejudice.
>
> 5. The Chancellor over the cause, Hon. Ron Harmon, stated to me after the hearing that the matter should be re-filed, as the Petitioners deserved a hearing of the matter.

6. The Judgment issued in that cause, Hardin County Chancery Docket No. 7424, mistakenly or inadvertently fails to include the language "without prejudice," with respect to the dismissal ordered.

(Emphasis in original).

Defendant did not state in the affidavit that he believed his signature on the order dismissing case 7424 was not his signature. Mr. Hopper testified that he did not forge Defendant's signature on the order. On November 5, 2009, the plaintiffs filed an amended motion for relief from judgment in case 7424. The motion did not allege a forgery.

Mr. Hopper testified that a hearing on the motion was conducted before Judge Parish on December 14, 2009. At the hearing, Defendant testified that case 7424 was dismissed, but that the order was not meant to be a final order. In his cross-examination of Defendant, Mr. Hopper asked Defendant about the order:

Q.      Mr. Powell, you signed the order, didn't you?

A.      I don't have the order in front of me, so I don't – I would assume I did.

. . . .

Q.      Mr. Powell, can you identify this document, please?

A.      I'll be happy to.

(Witness perusing documents.)

This appears to be the order that was entered in this matter, but that is not my signature. So I don't know if I gave permission or not.

Q.      That's not your signature?

A.      No, that's not mine.

Q.      Did you ever see this order before you – before it was filed?

A.      I don't recall.

Q.    Who signed that?

A.    I have no idea. I do not remember.

Q.    Are you saying that you authorized somebody else to sign it and it could have been somebody in your office?

A.    Oh, it wasn't somebody in my office, no.

Q.    What do you think happened?

A.    I really don't remember, Curtis. I mean, you know, it's back in May and June. I mean, that's nearly six months ago. I've slept since then.

Q.    Did you ever read the order? Have you ever read this order?

A.    Yes.

Q.    And you knew it was being entered.

A.    I don't recall that I knew before that order was entered that I saw it before it was entered. I've seen it since, I know. I'm not saying I didn't. I just don't remember.

Q.    You're saying that's not your signature, though.

A.    That is not my signature, no.

Q.    Okay.

       I'm curious as to why you didn't put that in your affidavit, that the order that was signed is not your signature.

A.    Because I hadn't seen the order at that time.

Q.    You signed the affidavit, though, correct?

A.    I did.

Q.     It was filed in this case on this motion, right?

A.     I did, right.

Q.     A moment ago, you testified that you couldn't speak for all the parties present, but in Paragraph 3, it says, "All parties present at the hearing understood that the case was being dismissed on technical grounds."

Is this your affidavit?

A.     Yeah, I believe.  Let me see it.

Q.     Look at Paragraph 3.

A.     (Witness perusing documents.)  Yeah and the rest of that paragraph is that the way it was being left open for the Petitioners to cure defects in the pleading is a refiled lawsuit.

And that was my understanding, yes.

Defendant testified at the hearing that he did sign the complaint filed in the case. Judge Parish also questioned Defendant:

Q.     So, you acknowledge that that is your signature [on the complaint]?

A.     Yes, sir.

Q.     Now I want to hand you, also, from the original file, the court clerk file in 7424, the order dated June 9, 2009, which has the effect of dismissing this case, and ask you, sir, is that your signature?

A.     That is not.

Q.     And tell me what you recall about the entry of that order.

A.     I don't remember ever seeing that order until I got a copy of it with the motion for sanctions is when I first remember seeing it.  Now, if I had seen a rough draft of it, you know, I may have.  I don't know.

Q. When was that that you say you first saw it?

A. It would have been in November.

Q. November of this year, as in last month?

A. Correct.

Q. Do you have your court file – pardon me, your office file regarding this matter?

A. I do not have it with me, no.

Q. All right. May we agree that the custom in terms of persons signing orders for other people, that would be limited either to an employee of your office, meaning a fellow lawyer within your office –

A. Which by June, there was no one else.

Q. That's what I'm getting at.

A. Right.

Q. And opposing counsel or other counsel involved in the case with permission.

A. Which the way I would do it and the way I've seen most people do it would be to sign the name and put "with permission" and their initials or their name. So, I don't know. I don't know what happened. I have no idea what happened with the order and how it got circulated. I don't recall even seeing it, you know, after we had the hearing. Now is my memory perfect? No, sir, it is not.

Q. That's all.

The attorney for the school board, a defendant in both civil cases, also asked Defendant about the order during the hearing:

Q. Mr. Powell, is there – you know Mr. Hopper, don't you?

A.    I do.

Q.    And he practices here in Hardin County [ ], doesn't he?

A.    He does.

Q.    Do you have a remembrance of Mr. Hopper approaching you with that order and asking you to sign it and you signing it?

A.    I don't, but like I said . . .

Q.    You don't remember that?

A.    I don't, no.

Q.    Thank you.

A.    I'm not denying that it happened, I just don't remember it.

Mr. Hopper testified at the trial in this case that Defendant was not truthful when he testified at the hearing that the signature on the order was not his. Mr. Hopper testified that he believed that the significance of Defendant denying that it was his signature was, "the very narrow exceptions to set aside a judgment that is already over with, if what he is saying is true and that was not his signature, it would be grounds to open that lawsuit up. That is a material matter."

In a written order denying the motion to set aside the judgment in case 7424, Judge Parish found Defendant's testimony "as to the material matters in dispute to be not credible." Following the entry of the order, Mr. Hopper was contacted by Agent Terry Dicus of the Tennessee Bureau of Investigation. Mr. Hopper gave Agent Dicus personal correspondence and documents from Mr. Hopper's case file that had Defendant's signature on them. The parties stipulated that the documents contained Defendant's signature.

On cross-examination, Mr. Hopper testified that he faxed the proposed order to Defendant on two occasions prior to Defendant signing the order. Mr. Hopper did not bring fax confirmations with him to court because he "wasn't asked to." Mr. Hopper testified that when he handed the order to Defendant to sign in the hallway of the courthouse that Defendant "scanned it, like most lawyers do. But [Defendant] made the comment, 'My clients are not happy with the result.' I remember it vividly. . . ."

-7-

Grant Sperry, a forensic document examiner, was qualified by the trial court as an expert in the field of forensic document examination. Mr. Sperry examined documents submitted to him for comparison. He reviewed the signatures from a collection of documents prepared during the normal course of business, and he reviewed the signature on the order dismissing case 7424. Mr. Sperry explained that individuals develop "a series of habits through repetition" and that "[handwriting] habits are unique to each individual. So no two individuals have ever been found to have[,] even with some of the studies that have been done on quintuplets and so forth over the years, have the same identical set of handwriting features and characteristics." He also testified that "no two writings by the same individual will ever be precisely alike."

Mr. Sperry testified that "accidentals" occur in handwriting when a person is writing, for example, in a moving car. He explained that the writing may contain "features and characteristics . . . that may never be repeated. It doesn't mean that the signature doesn't have value for identification." Prior to his examination of the documents in this case, Mr. Sperry was informed that Defendant had signed the order against a wall. Mr. Sperry testified that the "features" of that signature "were not replicated" in the submitted samples. He examined the signature microscopically, and he determined that the signature in question was illegible, and he described it as "a stylized signature, an abbreviated signature, kind of like a credit card signature, which many of us write." He testified that the signature was "naturally executed" and there were no "hard stops that would be indicative of either a simulation, . . ., or a tracing, . . . ." Mr. Sperry concluded that Defendant wrote the signature on the order. He testified that it was "much more likely than not, that [Defendant] made that particular signature." He testified, "my conclusion is that there are indications that [Defendant], whose writings are reflected in [the submitted documents], wrote the . . . signature on [the order]. It is a less than definitive finding." He further testified that he did not find indications that Defendant did not write the signature and that "the features and characteristics that perhaps in this case are not represented fully, I believe is due to simply some sort of accidental feature that was incorporated, writing position, writing situation, I don't know." Mr. Sperry testified that, in his opinion, the likelihood that Defendant wrote the signature was "approximately 80 percent[.]" On cross-examination, Mr. Sperry testified that Defendant "has a very wide range of writing variation" and that "it certainly is possible for an individual to recognize his signature and [to] not [be] able to recognize their signature."

Judge Donald Parish testified that he had been a circuit court judge for approximately five years and that he practiced law for 25 years prior to being elected a judge. Over defense counsel's objection, Judge Parish was qualified by the trial court as an expert "in the field of civil and criminal law." Judge Parish testified that he was the presiding judge in the judicial circuit during the civil proceedings involved in this case. He was the judge in case

7447. Judge Parish testified that the original complaint in case 7424 was filed by the Concerned Citizens of Hardin County, represented by Defendant, in an attempt to enjoin the defendants, the school board and the county, from constructing new schools. Attorneys for the defendants filed a motion to dismiss the complaint, which was granted by Chancellor Harmon following a hearing in May, 2009. A written order was entered on June 9, 2009, and the plaintiffs did not file a notice of appeal in that case.

Judge Parish testified that the same plaintiffs, represented by different counsel, filed a complaint in case 7447 on August 27, 2009. Chancellor Harmon recused himself from that case, and Judge Parish, as the presiding judge in the judicial circuit, assigned himself to preside over the case. In case 7447, the plaintiffs sought an injunction against the school board and the county, requiring that construction of schools be stopped and that the funds collected for the project be redirected. The defendants filed a motion to dismiss the second lawsuit. Judge Parish requested from all the parties' attorneys written briefs discussing the issue of res judicata, which Judge Parish testified, "is a legal doctrine, . . . . [which] in its simplest term [ ] means that this subject has previously been litigated." Following a hearing, Judge Parish granted the defendants' motion to dismiss, and an order was entered.

The plaintiffs subsequently filed a "Motion for Relief from Final Judgment" in case 7424. Judge Parish explained that the grounds for such relief are "[e]xtremely limited" under Tennessee Rule of Civil Procedure 60.02. Judge Parish testified that the plaintiffs' "only avenue left" was to "go back to case number 1 [7424] and file a motion to attempt to reopen case number 1" because the second lawsuit, case 7447, had been dismissed on the grounds of res judicata. Judge Parish testified that at the December 14, 2009, hearing on the plaintiffs' motion, Defendant testified as to a material fact regarding the issue of fraud, the ground upon which the plaintiffs sought to set aside the judgment. Judge Parish testified that Defendant's statement that the signature on the order dismissing case 7424 was "incredible." He testified that it was "beyond comprehension" because it would be "the very first thing a lawyer attacking the validity of a dismissal of a lawsuit would [do]." Judge Parish testified that during the hearing, it was his duty to determine the credibility of the witnesses. He testified that "there had been nothing to suggest [Defendant] was not credible until [they] got into [the] testimony about his signature." Judge Parish testified that he "immediately began to compare the signatures" on the pleadings contained in the court files while Defendant was testifying.

Judge Parish testified that he "chose to ask questions of [Defendant], while he was on the witness stand, relative to this question about his signature, because it had become such an important point on the final order." Judge Parish testified that the fact of whether or not the order bore Defendant's signature "was very material[.]" Judge Parish showed Defendant documents from the court file, and Defendant acknowledged his signature on those

documents. Judge Parish testified, "we had a very serious situation developing in the courtroom on that morning." He testified that "only one of two things was possible; either [Defendant] had committed perjury during his testimony or that someone had forged his signature. Both of which were serious issues and needed to be gotten to the bottom of [sic]."

Following the hearing, Judge Parish entered an order denying the plaintiffs' motion. He explained that he included Defendant's credibility in the written order in order to make his findings clear in the event of appellate review. Judge Parish "used [his] observations of [Defendant] during his testimony" in making his determination that Defendant was not credible. Judge Parish also noted that he believed it was significant that Defendant did not include a statement about the alleged forgery in his affidavit. Judge Parish found "no conceivable, logical explanation for why [Defendant] would not have said that in his affidavit." Judge Parish also testified that Defendant did not retract his statement that the signature was not his.

Following the hearing, Judge Parish, believing that a perjury had occurred in his courtroom, contacted the presiding judge of the Court of the Judiciary to clarify his duties. He then reported the alleged perjury to the District Attorney General's Office.

Stacy Battles testified on behalf of Defendant. She testified that she was the secretary for General Sessions Court Judge Ross in Wayne County. She testified that on June 9, 2009, Defendant was in court in Wayne County. She testified that court began at approximately 9:00 a.m. and that there was a recording from court that day that reflects that Judge Ross spoke to Defendant about Defendant's client who was not present in court. She testified that Defendant's client's last name was Whitley and that the docket was called in alphabetical order. She testified that Mr. Whitley's name was called at 9:52 a.m. Judge Ross then gave Defendant an opportunity to contact his client, and at 9:58 a.m., Defendant informed the court "that his client was not available." Ms. Battles testified that the Wayne County Justice Center, where the general sessions court is located, was approximately 34 miles away from the Hardin County Courthouse. She testified that it had taken her approximately 25 minutes to get to court in Hardin County from Waynesboro that day.

Defendant testified that he was 49 years old and had been practicing law for "[n]early 20 years." He had practiced law in Hardin County for four years, and he practiced in Memphis prior to moving to Hardin County. He represented the group known as Concerned Citizens of Hardin County in case 7424. Defendant testified that at the May 22, 2009, hearing, Chancellor Harmon dismissed the lawsuit. Defendant testified that he had agreed with his clients that he would not represent them on appeal. He referred his clients to another attorney. Defendant testified that he advised his clients "that they had a certain number of – amount of time to appeal it, if they wanted to appeal it, . . . ." He testified that attorney

Christopher Donovan, who was hired by the plaintiffs to represent them, "approached [him] and asked [him] what [his] understanding was about what happened in court" at the hearing. Mr. Donovan subsequently provided Defendant with an affidavit. Defendant believed the affidavit "accurately reflected . . . the situation," and Defendant told Mr. Donovan that it did. Defendant testified, "clearly, I was wrong, but that's what I understood to be the case." Defendant "saw no reason not to sign" the affidavit although he "didn't understand why Mr. Donovan cared or wanted to know what [Defendant's] understanding of what happened in court that day was."

Defendant testified that he received a subpoena to appear in court on December 14, 2009, and he "had no idea why." He testified that Mr. Donovan came to his office on the morning of the hearing and told him, "'You need to be in court right now.'" Defendant was "totally surprised by it." At the hearing, Mr. Donovan asked Defendant whether it was his signature on the order, and Defendant "assumed it was." He testified that he "had no reason to believe it wasn't." Defendant "had no idea why he was asking [him] about the order." Defendant testified that when he was presented the order, he "was given about that long to decide – to – to – to examine that signature, okay." He testified, "[W]hen I looked at the signature, it literally jumped off the page at me that, that just doesn't look like my signature." He testified that it was not his signature "after having less than 10 seconds to look over it."

Defendant testified that on June 9, 2009, he was in court in Wayne County "by nine o'clock." He testified that during an interview with Agent Terry Dicus, Defendant looked at his calendar and realized that he was not in court in Hardin County that morning. Defendant testified that he had "no recollection of signing the order, and it would have been impossible" for Defendant to sign it because he "was never [t]here." He testified that he would not have signed an order without first reading it. Defendant testified that the first time he saw the order was in court on the date of the hearing. He then testified that it was "possible [he had] seen it before that," but that he did not remember. He then testified that he had received a copy of the order with a motion for sanctions prior to the hearing. Defendant testified that he "never really examined it" and he thought that was "a lawyer just doing what lawyers do." Defendant "had no idea why [he] was being served with sanctions after [he] was even out of the [law]suit."

Defendant estimated that he provided Agent Dicus with "30 or 31" handwriting exemplars. He "was signing them up against a wall rapid fire," and Agent Dicus told him he "wasn't doing it right." Defendant testified that he "tried to comply with his orders, as best [he] could."

At trial, Defendant again testified that the signature on the order was not his. He testified that he was "very confused" at the hearing and that he did not understand how Judge

Parish had interpreted his testimony "until today." Defendant testified that he never said that a fraud had been committed upon the court. He believed it was "a mix up." Defendant did not "question the validity of the order."

Defendant testified that he misinterpreted Chancellor Harmon's ruling dismissing the lawsuit. He testified, "I guess I just heard what I wanted to, because I was in error." He testified that Chancellor Harmon had "stopped [him] in the hallway" as they were leaving the courtroom, and Defendant interpreted his comments "to mean that [the lawsuit] could be pursued further." He testified that he did not recall having seen the order before he signed the affidavit prepared by Mr. Donovan.

Tammy Wolfe testified as a rebuttal witness for the State. Ms. Wolfe testified that she was employed as the secretary for Hardin County General Sessions Judge Daniel Smith. She testified that on June 9, 2009, Defendant was listed as attorney of record for a client in a case on the 9:00 a.m. docket sheet. Ms. Wolfe testified that when an attorney asks for a case to be reset or passed from the morning to the afternoon docket, she normally puts a "sticky note" indicating such on the docket sheet. She testified that she "live[s] by the sticky notes" and "nobody removes the sticky notes." Ms. Wolfe testified that there was not a sticky note on the June 9, 2009, docket sheet to indicate that Defendant had contacted her and told her that he would be in court in another county on that morning. Ms. Wolfe also testified that Defendant's client had entered a guilty plea on December 16, 2008, at which time the case was continued for six months to be dismissed, and that Defendant did not have to be present in court on the day that it was dismissed.

Chancellor Ron Harmon presided over case 7424. Chancellor Harmon testified that he dismissed the lawsuit at the conclusion of a hearing on May 22, 2009. Chancellor Harmon testified that he did not tell Defendant in the hallway following the hearing that his ruling was not a final judgment in that case. Chancellor Harmon testified that Defendant approached the bench after the hearing and asked him, "How do I go about serving the County Mayor[?]" Chancellor Harmon testified that he was "taken by surprise," and he told Defendant "with a summons." Chancellor Harmon testified that Defendant was "mistaken" if he thought they had a conversation in the hallway.

*Sentencing hearing*

At the sentencing hearing, Tim Baker, a probation officer, testified that he prepared a presentence report, which was admitted into evidence. Mr. Baker testified that he discovered that Defendant had been convicted of driving under the influence ("DUI") in 1981. His investigation showed that Defendant pled guilty to DUI and received a "sentence of 11-29" with two days of jail credit, and the sentence was served on probation.

Defendant testified that he recalled the DUI incident from May 27, 1981, and stated that he understood "that it had all been dismissed." Defendant was 19 years old at the time of the incident.

*Analysis*

*Expert testimony*

Defendant contends that the trial court erred by allowing Judge Parish to testify "beyond the scope of his expertise" at trial because he was "not qualified as an expert in lie detection." The State responds that Defendant has waived this issue by failing to object to the testimony and failing to include the issue in his motion for new trial. We agree with the State. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection).

While Defendant initially objected to Judge Parish's qualifications to testify as an expert "in the field of civil and criminal law," Defendant did not specifically object to Judge Parish giving testimony about his conclusions regarding Defendant's credibility. The following exchange occurred during the parties' voir dire of Judge Parish:

> [ASSISTANT DISTRICT ATTORNEY]: Your Honor, I would – in light of the history, background, experience, and qualifications of Judge Parish, I would tender Judge Parish to the Court and ask that he be declared an expert witness.
>
> THE COURT: In the field of –
>
> [ASSISTANT DISTRICT ATTORNEY]: Of law.
>
> THE COURT: In the field of general law or –
>
> [ASSISTANT DISTRICT ATTORNEY]: Civil as well as criminal, please.
>
> THE COURT: Civil and criminal law. [Defense counsel]?
>
> [DEFENSE COUNSEL]: Yes, ma'am, I object. He's had experience. I don't deny that, but is he an expert?

THE COURT: During the course of your direct examination, is it important to that examination that you – that we qualify Judge Parish as an expert, General?

[ASSISTANT DISTRICT ATTORNEY]: Well, I just thought that it was appropriate, in light of his extensive background, his experience, his education of appellate emphasis, and – and he's going to be giving an opinion, based upon legal documents, as well as forming conclusions based on that training, background, and experience. And I just think it's appropriate that that question be asked.

Now, I – I understand what – it's very unusual to have a judge testify.

THE COURT: Yes, sir.

[ASSISTANT DISTRICT ATTORNEY]: Quite frankly, it's unusual to have a – a lawyer testify, but this is such a blending of civil and criminal matters, that it requires someone to have an additional level of expertise and experience.

THE COURT: And I think you've eluded for – or maybe it is in evidence, that Judge Parish is expected to give an opinion on credibility.

[ASSISTANT DISTRICT ATTORNEY]: That's correct.

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: Ma'am, I haven't heard anything yet today that – as far as Mr. – Judge Parish's publications, periodicals, peer reviews, any – anything to qualify Judge Parish as an expert.

THE COURT: So that we will have a good record, [defense counsel], do you want to examine, Voir Dire Judge Parish as to his qualifications being tendered to the Court as an expert in the field of criminal and civil law? Do you wish Voir Dire, because you are opposing that, aren't you?

[DEFENSE COUNSEL]: Yes, ma'am.

-14-

The specific testimony that Defendant asserts on appeal was admitted in error is Judge Parish's testimony regarding his conclusions about Defendant's credibility at the motion hearing in civil case 7424, and whether Defendant's testimony at the hearing "was a lie or that the lie was material." We note that Defendant concedes that it was not improper for Judge Parish to testify "to the surrounding circumstances involving the alleged aggravated perjury, including the facts that would make the lie material." Defendant objected at trial to Judge Parish's testimony concerning his observations of the signatures on the order and Defendant's signatures in the court file on the basis that Judge Parish was not qualified as "an expert on handwriting," and the trial court did not allow Judge Parish to give an opinion on the signatures. However, Defendant failed to object to Judge Parish's testimony concerning Defendant's credibility, the testimony about which he now complains.

Additionally, Defendant did not include this issue in his motion for new trial. Issues relating to the admission or exclusion of evidence that are not raised in a motion for new trial are deemed to be waived on appeal. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon an error . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.").

Finally, Defendant did not request in his brief on appeal that this issue be reviewed for plain error, *see* Tennessee Rule of Appellate Procedure 36(b), nor has Defendant filed a reply brief in which he requests plain error review. In light of Defendant's failure to object contemporaneously at trial and his failure to include the issue in his motion for new trial or request plain error review on appeal, we will not exercise our discretion to review the issue for plain error. *See* Tenn. R. App. P. 36(b) (stating that "[A]n appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice."). Accordingly, we conclude that Defendant has waived this issue and is therefore not entitled to relief.

*Probation denial*

Next, Defendant contends that the trial court erred by denying his request for full probation.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance

-15-

with the purposes and principles listed by statute." *Id*. at 709-10. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Recently, our supreme court held that the same abuse of discretion standard should be applied to the manner of service of a sentence, which includes the grant or denial of probation. *State v. Caudle*, 388 S.W.3d 273 (Tenn. 2012). When determining if confinement is appropriate, the trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. Tenn. Code Ann. § 40-35-103(1)(A)-(C) (2010). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. Tenn. Code Ann. §§ 40-35-103(5) (2010), -210(b)(5) (2010), *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. T.C.A. § 40-35-103(4). The burden of demonstrating the suitability for full probation rests with the defendant. Tenn. Code Ann. § 40-35-303(b) (2010 Repl.).

At the conclusion of the sentencing hearing, the trial court found that Defendant was not credible at trial and that Defendant had "absolutely no remorse." The court noted that Defendant "takes no responsibility, so there's no amenability to correction. He takes no responsibility and demonstrates no remorse." The court also found that "Defendant's incarceration could rationally serve as a deterrent to others similarly situated and likely to commit similar crimes" and that "[d]eterrence alone is sufficient to justify the denial of probation." The court also found that a sentence of full probation would unduly depreciate the seriousness of the offense. The court stated,

> This is not an ordinary citizen who lied under oath, but he's an officer of the Court, who not only violated the sanctity of the oath given to all witnesses, he violated the integrity of the oath he took as [an] officer of the Court to uphold the integrity of the judicial system; the very heart of our legal system and the very heart of why it should work, . . . .
>
> . . . .

-16-

[Defendant] happens to be a lawyer who cannot – who cannot tell the truth under oath. And in my mind, never will be able to, because he does not understand the ethics and the oath that he took as a lawyer. He accepts no responsibility.

The State asserts that Defendant has waived this issue by failing to cite to the record. Tennessee Rule of Appellate Procedure 27 requires that appellate briefs contain an argument containing citation to the record and legal authorities. Tenn. R. App. P. 27(a)(7). This court will deem an issue waived when a defendant has failed to support an issue with argument, citation to authorities, or appropriate references to the record. *See* Tenn. R. Crim. App. 10(b).

We note that Defendant's brief cites *State v. Mitchell*, 810 S.W.2d 733 (Tenn. Crim. App. 1991) and states, "[t]he granting [and revocation] of a suspended sentence rests in the sound discretion of the trial judge." Defendant concedes that he had a 1981 conviction for DUI and notes that the trial court gave significant weight to Defendant's status as an attorney guilty of aggravated perjury. Defendant contends, however, that "[e]vidently, the [t]rial [j]udge doubted the appropriateness of the sentence, because she stated that an [a]ppellate [c]ourt was likely to disagree." Defendant acknowledges that his "behavior was unacceptable." He asserts, however, that his status as a convicted felon and the loss of his license to practice law was sufficient punishment and that a sentence of incarceration was excessive punishment.

Our review of the record shows that the trial court considered the relevant sentencing principles and imposed an appropriate sentence of incarceration. Therefore, we will not disturb the trial court's sentence. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE